UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| TYLER TOOMEY and MARKAS SERGALIS, on behalf of themselves and all others similarly situated,<br><br>                          Plaintiffs,<br><br>        v.<br><br>RIPPLE LABS, INC., XRP II, LLC, BRADLEY GARLINGHOUSE, MCO MALTA DAX LIMITED (D/B/A CRYPTO.COM), FORIS DAX GLOBAL LIMITED (D/B/A CRYPTO.COM), FORIS DAX, INC., FORIS, INC., PAYWARD, INC. D/B/A KRAKEN<br><br>                          Defendants. | Civil Action No. 3:21-cv-00093-BJD-JBT |

**SECOND AMENDED CLASS ACTION COMPLAINT, DEMAND FOR JURY TRIAL, INJUNCTIVE RELIEF SOUGHT**

Plaintiffs Tyler Toomey and Markas Sergalis ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Ripple Labs, Inc. ("Ripple"), XRP II, LLC, Bradley Garlinghouse (the "Ripple Defendants"), MCO Malta Dax Limited (d/b/a Crypto.com), Foris Dax Global Limited (d/b/a Crypto.com), Foris Dax, Inc., and Foris, Inc. (collectively "Crypto.com"), and Payward, Inc. d/b/a Kraken ("Kraken") (collectively "Defendants").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding the Ripple Defendants' sale of XRP cryptocurrency tokens to Florida residents in violation of Florida securities laws, and Crypto.com

1

and Kraken's sale and participation in the sale of unregistered XRP in violation of federal securities laws and Florida law.  Specifically, the Ripple Defendants sold millions of dollars (or more) of XRP tokens, which are securities under Florida law, to Florida investors without registering the same either with federal or Florida authorities.  In turn, Crypto.com and Kraken sold or participated in the sale of tens of millions of dollars (or more) of unregistered XRP tokens to investors in the United States and in the State of Florida, without being registered as a securities broker or exchange.

2.      Recently, the United States Securities and Exchange Commission ("SEC") filed a lawsuit against the Ripple Defendants and certain other individuals, *Securities And Exchange Commission v. Ripple Labs, Inc., et al.*, Case No. 1:20-cv-10832 (S.D.N.Y.), alleging that "[f]rom at least 2013 through the present, Defendants sold over 14.6 billion units of a digital asset security called 'XRP,' in return for cash or other consideration worth over $1.38 billion U.S. Dollars ("USD"), to fund Ripple's operations [. . .]. Defendant[] undertook this distribution without registering their offers and sales of XRP with the SEC as required by the federal securities laws, and no exemption from this requirement applied."[1]  The Ripple Defendants similarly failed to comply with Florida securities laws by failing to register with the Florida Office of Financial Regulation or any other appropriate Florida agency.  *See* Fla. Stat. Ann. § 517.081; *see also* Fla. Stat. Ann. § 517.021(8) (" 'Office' means the Office of Financial Regulation of the commission.")

3.      Under the Florida Securities and Investor Protection Act (the "Act"), "[i]t is unlawful [. . .] for any person to sell or offer to sell a security within this state unless the security is exempt [or] registered pursuant to this chapter."  Fla. Stat. Ann. § 517.07(1).  The Act further

---

[1] The SEC's Complaint is attached hereto as Exhibit A.

provides that "[n]o securities that are required to be registered under this chapter shall be sold or offered for sale within this state unless such securities have been registered pursuant to this chapter and unless prior to each sale the purchaser is furnished with a prospectus meeting the requirements of rules adopted by the commission." Fla. Stat. Ann. § 517.07(2).

4.     Ripple's XRP tokens are securities because they qualify as "investment contracts" under Florida law. Fla. Stat. Ann. § 517.021(22)(q).

5.     The Ripple Defendants did not provide Florida investors with material information regarding the offering of XRP, as would have been required had the Ripple Defendants complied with the law.

6.     The Ripple Defendants began their unregistered and unlawful sale of XRP in 2013, despite having knowledge as early as 2012 that XRP could be considered an "investment contract" under federal and, by extension, Florida law. Nevertheless, the Ripple Defendants chose to disregard filing requirements and initiated a vast offering of XRP without registration. Further, the Ripple Defendants made affirmative representations to the investing public that XRP is not a security, when in fact it is. The Ripple Defendants also engaged in material omissions regarding the true nature of XRP.

7.     The Ripple Defendants continued to sell unregistered XRP to investors from 2013 through the present. However, after the filing of the SEC suit, several major cryptocurrency exchanges have elected to delist XRP, ostensibly to avoid or mitigate potential liability for selling an unregistered security. This includes major exchanges Coinbase, Binance.US, OkCoin, and most recently Blockchain.com.[2]

8.     Through this strategy, the Ripple Defendants have raised well over a billion

_____

[2] https://cointelegraph.com/news/blockchain-com-follows-other-exchanges-in-delisting-xrp (last visited 1/7/21).

dollars through the sale of XRP, which has been used to fund the company's operations, as well as substantially enriching Ripple's executives, to the tune of $600 million.

9.      The Ripple Defendants still hold substantial XRP that they can continue to monetize, while creating substantial risk to investors.  As such, injunctive relief is appropriate.

10.     Defendant Crypto.com operates as a smartphone application that allows users to buy and sell cryptocurrencies, which, until January 19, 2021, included XRP.[3]

11.     However, Crypto.com is not registered as a broker-dealer with the SEC, nor is it registered as an exchange.  As such, Crypto.com is not authorized to participate in the sale of securities pursuant to federal law.  *See* 15 U.S.C. § 78o (a)(1) ("It shall be unlawful for any broker or dealer . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered"); 15 U.S.C. § 78e ("It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to . . . effect any transaction in a security . . . unless such exchange . . . is registered as national securities exchange under section 78f of this title").  By offering XRP on its application for buying and selling, Crypto.com was acting as an unregistered broker and also as an unregistered exchange. Therefore, Crypto.com violated federal securities laws.

12.     Further, because Crypto.com participated in the sale of XRP, it has engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").  15 U.S.C. §§ 77e(a) and 77e(c).

13.     Crypto.com also collects fees from users for buying and selling cryptocurrencies, including XRP.  Because fees collected by Crypto.com for sales of XRP were obtained unlawfully, restitution of the same is warranted.

---

[3] https://blog.crypto.com/xrp-delisting-from-the-crypto-com-app-in-the-u-s/ (last visited 3/10/21).

14.     Defendant Kraken operates as a cryptocurrency exchange that allows users to buy and sell cryptocurrencies, which, until January 29, 2021, included XRP.[4]

15.     However, Kraken is not registered as a broker-dealer with the SEC, nor is it registered as an exchange.  As such, Kraken is not authorized to participate in the sale of securities pursuant to federal law.  *See* 15 U.S.C. § 78o (a)(1) ("It shall be unlawful for any broker or dealer . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered"); 15 U.S.C. § 78e ("It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to . . . effect any transaction in a security . . . unless such exchange . . . is registered as national securities exchange under section 78f of this title").  By offering XRP on its application for buying and selling, Kraken was acting as an unregistered broker and also as an unregistered exchange.  Therefore, Kraken violated federal securities laws.

16.     Further, because Kraken participated in the sale of XRP, it has engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act.  15 U.S.C. §§ 77e(a) and 77e(c).

17.     Kraken also collects fees from users for buying and selling cryptocurrencies, including XRP.  Because fees collected by Kraken for sales of XRP were obtained unlawfully, restitution of the same is warranted.

18.     Based on the foregoing, and the allegations set forth below, Plaintiffs bring this action for violation of the Florida Securities and Investor Protection Act against the Ripple Defendants, violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.* ("FDUTPA") against all Defendants, violation of the Securities Act against

---

[4] https://blog.kraken.com/post/7450/kraken-to-halt-xrp-trading-for-u-s-residents/ (last visited 3/21/21).

Crypto.com and Kraken, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, and money had and received.  Plaintiffs also seek a permanent injunction against Defendants to prevent any further unregistered sales of XRP.

19.     As a result of Defendants' conduct, Plaintiffs and members of the Classes (defined below) have suffered damages.

## PARTIES

20.     Plaintiff Tyler Toomey is a citizen of Florida.  Plaintiff Toomey purchased 135 XRP on or around November 24, 2020 for $97.80.  Plaintiff Toomey sold his XRP first in a transaction on or around December 7, 2020 wherein he sold 33.1 XRP for $20, and second in a transaction on or around December 28, 2020 wherein he sold 101.9 XRP for 0.0383 Ethereum ($28.56).  Thus, Plaintiff Toomey sustained a loss of $48.56, or just over 50% of his initial investment.  Plaintiff Toomey purchased his XRP through Crypto.com.  Before deciding to purchase XRP, Mr. Toomey performed an internet search to determine whether XRP would be a worthwhile investment.  In doing so, Mr. Toomey reviewed various materials about XRP, including internet articles containing information regarding XRP.  These articles included information promulgated by the Ripple Defendants regarding XRP.  Plaintiff Toomey relied on these representations (and omissions) in choosing to invest in XRP.  After reviewing the materials, Plaintiff decided to invest in XRP, ultimately suffering a loss.  At no time prior to purchase of XRP was Plaintiff Toomey made aware that XRP was in fact an unregistered security.  Had Plaintiff Toomey known that XRP was in fact an unregistered security, he would have been aware of that fact and would not have purchased XRP.

21.     Plaintiff Markas Sergalis is a citizen of Florida who resides in Clearwater, Florida.  From approximately 2017 through the present, Plaintiff Sergalis purchased XRP

through Kraken.  Mr. Sergalis chose to invest in XRP after researching Ripple, including Ripple's technology and public statements made by Ripple regarding the Ripple company generally and XRP.  Specifically, Mr. Sergalis visited Ripple's website prior to investing in XRP, and reviewed information on Ripple's website regarding XRP.  Ripple's website did not disclose that XRP is in fact an unregistered security.  Mr. Sergalis also viewed internet videos containing content from Ripple representatives touting XRP.  Mr. Sergalis relied on the representations (and omissions) from Ripple and its agents in choosing to invest in XRP.  After reviewing the materials, Plaintiff Sergalis decided to invest in XRP, ultimately suffering a loss. In total, Mr. Sergalis purchased approximately 500,000 XRP.  Mr. Sergalis currently holds approximately 70,000 XRP.  In total, Mr. Sergalis has sustained losses totaling approximately $170,000 since purchasing XRP.  Approximately $100,000 of these losses occurred at or around the time of the SEC's announcement of its lawsuit against Ripple for selling unregistered securities.  At no time prior to purchase of XRP was Plaintiff Sergalis made aware that XRP was in fact a registered security.  Had Plaintiff Sergalis known that XRP was in fact an unregistered security, he would have been aware of that fact and would not have purchased XRP.

22.     Defendant Ripple Labs, Inc. is a Delaware corporation with a principal place of business at 315 Montgomery Street 2nd Floor San Francisco, California 94104.

23.     Defendant XRP II, LLC is Ripple's wholly-owned subsidiary. It was founded in approximately 2013, has been organized as a New York limited liability company since at least 2015, and is the entity through which Ripple offered and sold most of its XRP.

24.     Defendant Bradley Garlinghouse is the Chief Executive Officer of Ripple. Defendant Garlinghouse became CEO of Ripple in or around January 2017.  Defendant Garlinghouse was Ripple's President and Chief Operating Officer from approximately April

2015 through December 2016.  Defendant Garlinghouse is a resident of San Mateo, California.

Garlinghouse exercised control over Ripple and directed and/or authorized, directly or indirectly,

the sale and solicitation of XRP to the public.

25.     Defendant MCO Malta Dax Limited (d/b/a Crypto.com) is a company

incorporated under the laws of Malta, with a registered address of Level 7, Spinola Park, Triq

Mikiel Ang Borg, St Julian's SPK 1000, Malta.  Upon information and belief, Crypto.com

maintains a headquarters at Unit 1506-07, 15/F, Pacific Plaza 418 Des Voeux Rd W, Hong

Kong.  Defendant Crypto.com sold XRP through its platform to investors in the United States,

including in the state of Florida.

26.     Defendant Foris Dax Global Limited (d/b/a Crypto.com) is a company

incorporated under the laws of Ireland with a registered address of 70 Sir John Rogersons Quay,

Dublin 2, Ireland.  Upon information and belief, Crypto.com maintains a headquarters at Unit

1506-07, 15/F, Pacific Plaza 418 Des Voeux Rd W, Hong Kong.  Defendant Crypto.com sold

XRP through its platform to investors in the United States, including in the state of Florida.

27.     Defendant Foris Dax, Inc. is a corporation organized under the laws of Delaware.

Foris Dax, Inc. is registered as a Foreign Profit Company and is registered to do business in the

state of Florida.  Foris Dax, Inc.'s address is registered as 1170 Peachtree Street NE #1200,

Atlanta, GA 30309.  Upon information and belief, Foris Dax, Inc. is a United States based

subsidiary of Crypto.com, and has participated in the sale of XRP to investors in the United

States.

28.     Defendant Foris, Inc. is a corporation organized under the laws of Delaware.

Upon information and belief, Foris Inc. is a United States based affiliate of Crypto.com, and has

participated in the sale of XRP to investors in the United States.

29.     Defendant Payward, Inc. d/b/a Kraken is a corporation organized under the laws of Delaware with a principal place of business in San Francisco, California.  Defendant Kraken sold XRP through its platform to investors in the United States, including in the state of Florida.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action pursuant to 15 U.S.C.A. § 77v (as it relates to the federal claims against Crypto.com and Kraken) and 28 U.S.C. § 1332(d)(2)(A) (as to the rest of the claims), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below (the "Class"), is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District.

32.     Defendants are subject to personal jurisdiction in this District because they (a) are authorized to conduct business in Florida and have intentionally availed themselves of the laws and markets within Florida through the promotion, marketing, distribution, and sale of the XRP tokens at issue in this District; (b) because Plaintiffs purchased XRP tokens in Florida; and (c) pursuant to 15 U.S.C.A. § 77v (as it relates to the federal claims against Crypto.com and Kraken).

## FACTS COMMON TO ALL CLAIMS

### A.  Background On Crypto-Assets

33.     XPR is a digital token created by Ripple which falls into the general realm of crypto-assets, colloquially referred to as "cryptocurrencies."  But as discussed below, XRP is

really an unregistered security sold to Plaintiffs and Class members in violation of federal and Florida law.

34.     Bitcoin was the first major crypto-asset which grew in popularity due to three main features:  1) it offers a secure medium of exchange, 2) supply is controlled, and 3) it is decentralized.

35.     Bitcoin offers a secure medium of exchange because it can be securely transferred to only one person at a time through a digital ledger system known as a "blockchain."  The blockchain ledger system tracks the ownership of every Bitcoin in existence.  Every Bitcoin user has a digital address, tantamount to a bank account number, that is used to receive Bitcoin.  The blockchain lists every address and amount of Bitcoin associated with that address.  The history of every transaction involving each Bitcoin is set forth on the blockchain, which can be used to verify each transaction.

36.     Bitcoin both maintains the blockchain and controls supply through a process called "mining."  Miners essentially work as auditors of the blockchain to verify Bitcoin transactions.  This is a complex and process done through sophisticated computer programs.  Miners who verify the transactions are rewarded with new Bitcoin.  Because the verification process gets more and more difficult as more and more Bitcoin is produced and more transactions take place, it becomes harder to mine.  This natural check ensures that there are no sharp increases in supply.  Additionally, the number of Bitcoin that miners receive for their work is halved approximately every four years.  This continues until all Bitcoin is mined, at which

point miners will simply receive a fee paid by network users.  This is why Bitcoin is sometimes referred to as "digital gold."[5]

37.     Bitcoin is also decentralized.  There is no "Bitcoin, Inc." or company behind Bitcoin on a centralized server that can issue more Bitcoin on a whim.  Instead, Bitcoin relies on a peer-to-peer network in which each user is, in theory, an equivalent owner and contributor to the network.  These peer-to-peer transactions also leave out the middleman (for example, a bank) and allow users to transact directly.  As such, the success of Bitcoin does not depend on any centralized entity.

38.     After Bitcoin, there has been a sharp rise in the number of crypto-assets, some of which have features similar to Bitcoin and some of which differ significantly.

39.     For example, XRP has very few of the defining characteristics of Bitcoin.

40.     The first major difference is that XRP is not "mined," it was simply created by the Ripple Defendants out of thin air.  As such, supply is completely controlled by the Ripple Defendants.[6]  Also unlike Bitcoin, XRP transactions are powered through a centralized blockchain (the XRP ledger) mostly inaccessible to retail investors.[7]

41.     This means that the Ripple Defendants have complete control over the supply of XRP that is sold into the market place.  There is no safeguard, other than those imposed by the Ripple Defendants, to prevent sharp increases in the amount of XRP, rendering it a very speculative and risky investment.  In short, the Ripple Defendants can issue XRP on a whim.

---

[5] https://www.reuters.com/article/crypto-currencies-jpm/bitcoin-emergence-as-digital-gold-could-lift-price-to-146000-says-jpm-idUSL8N2JG2MM (last visited 1/7/21).

[6] https://www.investopedia.com/news/why-some-claim-ripple-isnt-real-cryptocurrency-0/#:~:text=Ripple%20has%20no%20mining%20or,it%20more%20reliable%20and%20fast.&text=In%20cryptocurrency%2C%20miners%20are%20incentivized,issues%20that%20Ripple%20deems%20untenable. (last visited 1/7/21).

[7] *Id.*

**B.  The Creation of XRP**

42.     In approximately late 2011 to 2012, Ripple founders began work on the XRP Ledger, which is software code that operates as a peer-to-peer database, spread across a network of computers, that records data respecting transactions, among other things.

43.     Ripple was formally founded in 2012.

44.     When the XRP Ledger was completed in December 2012, a fixed supply of 100 billion XRP was created.

45.     Ripple executives transferred 80 billion XRP to Ripple and 20 billion to themselves.  As such, Ripple and its co-founders controlled 100% of the XRP in existence at its inception.

46.     XRP is a crypto-asset and a "native token" on the XRP Ledger.  A "native token" is a token that is represented on its own blockchain.

47.     Ripple originally called XRP "Ripple Credits" and, for several years thereafter, participants in the digital asset space simply referred to the digital asset as "Ripples."

48.     Ripple could do little with its billions of XRP at the time of its inception, however, because the XRP tokens lacked any intrinsic value.  Ripple had limited funds to pursue any operations it may have sought to undertake. Ripple determined to create a market for and sell XRP to the public to monetize its holdings and finance its operations.

**C.  Ripple Made Unregistered Offers And Sales Of XRP To Fund Its Operations And Monetize Its Holdings Of XRP**

49.     By 2013, Ripple made a concerted effort to create a market for XRP.

50.     As part of Ripple's campaign to accomplish its twin aims of creating a market for XRP (increasing speculative demand and trading volume) and monetizing its holdings of XRP to finance its operations, the Ripple Defendants made public statements aimed at investors to create

in the investors an expectation of profit, while simultaneously engaging in a web of transactions designed to create a market for XRP.

**1. The Ripple Defendants And Affiliates Tout XRP As A Valuable Investment Vehicle**

51.     Throughout the duration of the XRP offering, the Ripple Defendants have made representations to investors marketing XRP as a lucrative speculative investment.

52.     In or around May 2013, Ripple circulated a promotional document to investors in which it explained that its "business model is based on the success of its native currency," that it would "keep between 25% to 30%" of XRP, and noted the "record highs" of prices other digital assets had achieved as something Ripple hoped to emulate for XRP.

53.     On May 12, 2013, a Ripple agent posted on Bitcoin Forum, a popular digital asset forum: "As a corporation, we are legally obligated to maximize shareholder value. With our current business model, that means acting to increase the value and liquidity of XRP. We believe this will happen if the Ripple network is widely adopted as a payment system. . . . One would expect increased demand to increase price."

54.     Ripple touts XRP on its website, stating that "XRP is traded on more than 100 markets and exchanges worldwide that are not affiliated with Ripple."[8]

55.     In a 2017 Market Report, Ripple discussed a conference called "Swell" which was a promotional event designed to bolster the value of XRP, which succeeded.[9]  Ripple noted in the Market Report that anticipation regarding the "Swell" event "spurred a meaningful spike in XRP, pushing it up 100 percent, from $0.15 to $0.30 on $4.56 billion of volume, all without a corresponding rally in [Bitcoin] or [Ether (another crypto-asset)]. In fact, XRP's 23 percent Q-o-

---

[8] https://ripple.com/xrp/buy-xrp/ (last visited 1/18/21).
[9] https://ripple.com/xrp/q3-2017-xrp-markets-report/ (last visited 1/18/21).

Q volume increase, as well as the overall volume record set during the quarter, can largely be attributed to activity during the three-day period between August 22 -24."[10]

56.     The Market Report further noted that the Ripple Defendants' goals going forward involved growing over-the counter XRP markets:  "In Q3, two of our most important objectives were to bolster our XRP lending and help grow over the counter (OTC) XRP markets. Our work in OTC markets was quite successful. We were able to diversify our pipeline of OTC buyers and establish relationships with most of the key OTC market makers in the space. We'll look to leverage this momentum as we continue to help build out OTC liquidity in Q4."[11]

57.     Around the same time, Coindesk, whose parent company Digital Currency Group holds an ownership stake in Ripple, published an article advertising that XRP had surpassed $1 for the first time, and touted XRP as a potentially lucrative investment vehicle:  "XRP is trading at $1.05. The cryptocurrency has gained 36 percent in the last 24 hours and is up 74 percent week-on-week. Its market cap currently stands at $41 billion, also a new record high."[12]

58.     Defendant Garlinghouse has also been active in advertising XRP as a lucrative investment vehicle.  For example, in a 2017 interview with BNN, when asked if he is personally invested in XRP, Defendant Garlinghouse stated "I'm long XRP, I'm very, very long[13] XRP as a percentage of my personal balance sheet."[14]  Defendant Garlinghouse further stated that he is "not long on some of the other [digital] assets, because it is not clear to me what's the real utility,

---

[10] *Id.*

[11] *Id.*

[12] https://www.coindesk.com/ripple-price-passes-historic-1-milestone (last visited 1/18/21).

[13] To be "long" on a security means that the investor owns and is expecting that the security will rise in value in the future.  https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/stock-purchases-and-sales-long-and#:~:text=Glossary-,Stock%20Purchases%20and%20Sales%3A%20Long%20and%20Short,is%20a%20%E2%80%9Cshort%E2%80%9D%20position. (last visited 1/25/21).

[14] See @JonErlichman, TWITTER (Dec. 14, 2017, 9:11 AM), https://twitter.com/jonerlichman/status/94135496422752261.

what problem are they really solving." He ended by reiterating, "if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that. We have been really fortunate obviously, I remain very, very, very long XRP, there is an expression in the industry HODL[15], instead of hold, it's HODL . . . I'm on the HODL side."

59.     Defendant Garlinghouse later "tweeted" that "Bloomberg welcomes $XRP to @theterminal and gets it right - #2 market cap behind $BTC at ~$80BB!"[16]  Once again, this was an attempt by Defendant Garlinghouse, acting on behalf of Ripple, to bolster XRP as an investment vehicle.  This is one example of several posts on the subject in which Defendant Garlinghouse solicited investors to purchase XRP.

60.     Ripple itself added to the marketing, "tweeting" on March 24, 2017 that "[t]he price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."[17]  This is one example of several posts in which Ripple marketed XRP as an investment vehicle, soliciting investors to invest their money in XRP.

61.     Defendant Garlinghouse has also directly tied the success and value of XRP to the success of the Ripple enterprise.  For example, on September 11, 2017, Garlinghouse stated in an interview with CNBC: "People are looking at the success Ripple has been having as a company, and I think that's increased the value of XRP."

---

[15] "HODL is a term derived from a misspelling of 'hold' that refers to buy-and-hold strategies in the context of bitcoin and other cryptocurrencies."  *See* https://www.investopedia.com/terms/h/hodl.asp (last visited 1/19/21).

[16] @bgarlinghouse, TWITTER (Dec. 14, 2017, 10:33 AM), https://twitter.com/bgarlinghouse/status/ 941375649549246464.

[17] @Ripple, TWITTER (Mar. 24, 2017, 11:53 AM), https://twitter.com/Ripple/status/845347809830 195200.

## 2.  The Ripple Defendants' Transactions Involving XRP

62.     To effectuate their plan, the Ripple Defendants sold and/or distributed XRP through various chains of distribution, summarized below.

63.     <u>First</u>, from 2013 through 2014, Ripple made efforts to create a market for XRP by distributing approximately 12.5 billion XRP through "bounty programs" that paid programmers compensation for reporting problems in the XRP Ledger's code. As part of these calculated steps, Ripple distributed small amounts of XRP (typically between 100 and 1,000 XRP per transaction) to anonymous developers and others to establish a trading market for XRP.

64.     <u>Second</u>, beginning in at least 2013, Ripple, largely through Defendant XRP II, LLC, also made large offerings of XRP to investment funds and sophisticated investors.  In total, the Ripple Defendants sold approximately 4.9 billion XRP (worth approximately $624 million) to institutional investors.  The purpose of this sale of XRP was to fund Ripple's operations and develop a speculative trading market in XRP.

65.     These sales to institutional investors were part of the Ripple Defendants' strategy to generate speculative interest in XRP from public investors. As Ripple stated in a document published on its website on January 24, 2017, Ripple's institutional sales of XRP were "indicative of [XRP's] broader capital market potential."

66.     The agreements between the Ripple Defendants and institutional buyers of XRP typically provided no restrictions on the buyer's ability to resell XRP, provided only brief lock-up periods (during which the investor could not resell its XRP) of typically three to twelve months, and did not limit the buyer's ability to resell quantities of XRP that could potentially lower XRP's trading price.

67.     In other words, Ripple expected that most, if not all, institutional buyers would sell their XRP into public markets and tried to protect XRP's trading price by limiting the amounts that could be resold during any given time period. By selling at discounts to market prices, Ripple incentivized these buyers to seek to sell their XRP into the public markets in order to realize what was essentially a guaranteed profit.

68.     Third, the Ripple Defendants sold XRP on the open market.  In total, the Ripple Defendants sold approximately 3.9 billion XRP on the open market, valued at approximately $763 million.

69.     Ripple conducted the open market sales first by transferring ownership of XRP on the XRP Ledger directly to investors and later by using traders who specialized in algorithmic digital asset trading to offer and sell XRP to investors, both on the XRP Ledger and on digital asset trading platforms, both in exchange for fiat currencies or other digital assets such as Bitcoin.

70.     As will be discussed in depth below, the Ripple Defendants conducted these open market sales in large part by paying commissions, denominated in XRP, for executing Ripple's XRP sales to the public on digital asset trading platforms.

71.     To bolster open market sales, Ripple has also directed all readers of its website to information about "How to Buy XRP" and has provided a list of digital asset trading platforms, including some with principal places of business in the United States, on which investors can make those purchases.

72.     While acting as Ripple's CEO, Defendant Garlinghouse had final decision-making authority over which trading venues to use for the open market sales and how much XRP

to sell on a particular venue, which Ripple communicated to traders as an overall percentage of XRP's daily trading volume.

73.     At Ripple's direction, the intermediary sellers ensured that the open market sales were programmatically set not to exceed a certain percentage of XRP's overall daily trading volume, and Ripple referred to the open market sales as "programmatic sales."

74.     Fourth, the Ripple Defendants enlisted others to assist Ripple in developing a market for XRP, compensating them with XRP.  In total, the Ripple Defendants paid out approximately 4.05 billion XRP to such individuals, valued at approximately $500 million. Ripple understood that these parties would in turn sell XRP into the public markets (often explicitly dictating the terms under which the parties could make these sales).

75.     This fourth category of XRP distribution itself encompasses five subcategories.

76.     The first subcategory is XRP offered as executive compensation distributions. Between December 2016 and at least May 2019, Ripple granted certain of its executives a total of approximately 900 million XRP in consideration for their labor as Ripple employees, at least 597 million of which Ripple has already tendered to these executives.  On December 13, 2016, Ripple granted Defendant Garlinghouse 500 million XRP as part of a compensation agreement. Ripple granted Defendant Garlinghouse an additional 250 million XRP on May 29, 2019.  These XRP grants to Defendant Garlinghouse totaled approximately $246 million.

77.     Defendant Garlinghouse, between April 2017 and December 2019, sold approximately 321 million XRP to public investors, worth approximately $150 million. Defendant Garlinghouse sold his XRP through digital asset trading platforms and/or other intermediaries.

78.     The second subcategory is XRP provided for on-demand liquidity distributions. As described below, in late 2018 Ripple began to market a product ("On-Demand Liquidity" or "ODL," also called "xRapid") for money transmitting businesses to buy XRP in one jurisdiction, transfer it to a separate destination, and sell XRP for the local fiat currency, to effect cross-border payments. To encourage adoption of ODL, Ripple paid XRP to both the money transmitting businesses and certain market makers that supported the product for their efforts.  Ripple chose to compensate these entities (which were not investors in XRP) with XRP directly, understanding that they would monetize their fees by selling XRP into public markets.

79.     From approximately December 2018 through July 2020, Ripple issued at least 324 million XRP as fees, rebates, and incentives to entities associated with ODL, without restricting the ability of these entities to resell the XRP received as incentives into public markets. This XRP was valued at approximately $67 million at the time of Ripple's payments. These entities typically have resold all the XRP they have received from Ripple to investors in the public markets, typically on the same day that they received the XRP from Ripple.

80.     Ripple took no steps to ensure that these entities intended to hold XRP as an investment. To the contrary, Ripple gave these entities XRP to sell into the public markets.

81.     The third subcategory is XRP sold into the market by related entities.  First, in 2015 and 2017, Ripple issued at least 2 billion XRP as contributions to "RippleWorks," an entity Ripple's former CEO co-founded to invest in, among other things, XRP-related projects to further Ripple's goals of achieving widespread trading of XRP in the market.  On February 1, 2017, Ripple committed an additional one billion XRP to RippleWorks.  Ripple took no steps to ensure that RippleWorks intended to hold XRP as an investment. To the contrary, Ripple gave XRP to RippleWorks so it would sell XRP into the public markets.

19

82.     Second, from approximately April 2018 through August 2020, Ripple publicly marketed an initiative it called "xPring," through which it distributed over 776 million XRP to at least 27 different entities or projects with the shared expectation that the entities would resell XRP to further Ripple's goals of achieving widespread XRP distribution. Ripple called xPring "a new initiative by Ripple that will invest in, incubate, acquire and provide grants to companies and projects run by proven entrepreneurs" in hopes of achieving Ripple's stated goal of working to develop a use for XRP.  Ripple used xPring as yet another way to get XRP into the hands of public investors through conduits, while obtaining the added benefit of incentivizing third parties to help Ripple pursue its XRP goals. Ripple gave XRP to these entities so they would sell it into public markets and took no steps to ensure that xPring-funded parties would not resell their XRP to the public.

83.     The fourth subcategory is the sale of XRP options.  From January 2018 through December 2019, Ripple sold at least 1.63 billion XRP when certain entities exercised options to buy XRP that Ripple had granted.

84.     The fifth subcategory is payments made to digital asset trading platforms to support XRP's trading market.  In 2017 and 2018, Ripple also entered into agreements with at least ten digital asset trading platforms—none of which were registered with the SEC in any capacity, and at least two of which have principal places of business in the United States— providing for listing and trading incentives with respect to XRP. Ripple paid these platforms a fee, typically in XRP, to permit the buying and selling of XRP on their systems and sometimes incentives for achieving volume metrics.

85.     As just one example of these arrangements, in May 2017, Ripple gave a digital asset trading platform, based in the United States, 17 million XRP in exchange for the platform's

agreement to make XRP available to buy and sell on its platform, as well as rebates on trading fees of up to $60,000 per month for three months, and up to $150,000 in incentive payments per month for three months to the top three traders of XRP for other assets on the platform.

86.     Between October 2016 and October 2017, Ripple distributed approximately 28 million XRP to these platforms, with a then-current market value of $6.8 million.

87.     Ripple made these efforts because it believed that increased trading volume for XRP on digital asset trading platforms would create "momentum" for XRP.

88.     Ripple tried repeatedly and unsuccessfully to persuade a certain digital asset trading firm to "list XRP on [its] exchange" by offering to "cover implementation costs, paying rebates, [and] brokering intros to large XRP holders for custody."

89.     Two major examples are trading platforms Coinbase and Gemini, which are popular because they allow customers to purchase crypto-assets with U.S. dollars.   Ripple attempted to pay both exchanges to list XRP because it would likely substantially increase the value of XRP.[18]   Indeed, XRP rose based on the mere speculation that it would be listed on Coinbase and Gemini.[19]

90.     In total, the Ripple Defendants sold approximately $14.6 billion worth of XRP.

### D.  Defendant Ripple's Income Is Disproportionately Derived From Sales Of XRP

91.     Defendant Ripple offers software products and enterprise solutions for sale, known as xCurrent, xRapid, and xVia, but its primary source of income is sales of XRP to investors.   Indeed, revenue from these software products pale in comparison to the revenue Ripple derives from sales of XRP.

---

[18] https://www.bloomberg.com/news/articles/2018-04-04/ripple-is-said-to-struggle-to-buy-u-s-listing-for-popular-coin (last visited 1/18/21).
[19] *Id.*

92. Ripple's sales of XRP have allowed it to meet its ballooning expenses.

93. For example, Ripple's expenses in 2013 and 2014 alone amounted to approximately $25 million. In 2017, Defendants began accelerating Ripple's sales of XRP because, while Ripple's expenses continued to increase (reaching nearly $275 million for 2018), its revenue outside of XRP sales did not.

94. Starting in 2016, Ripple began selling two software suites, xCurrent and xVia, from which it has earned approximately $23 million through 2019, though neither uses XRP or blockchain technology. Ripple raised about $97 million in sales of equity securities through 2018 and an additional $200 million in 2019. In other words, the overwhelming majority of Ripple's revenue came from its sales of XRP (over $1 billion), and Ripple relied on those sales to fund its operations.

95. The Ripple Defendants sell large quantities of XRP to the general public via cryptocurrency exchanges such as Defendant Crypto.com, Defendant Kraken, Coinbase, Binance.US, OkCoin, and Blockchain.com. However, most exchanges are in the process of delisting XRP.

**E. XRP Does Not Have A Functional, Non-Investment Use**

96. The Ripple Defendants offered and sold XRP to any person, without restricting offers or sales to persons who had a "use" for XRP and without restricting anyone's ability to resell their XRP to investors within the United States or elsewhere.

97. Indeed, for the ordinary retail investor like Plaintiffs and members of the Classes (defined below), XRP has no functional, non-speculative use. XRP cannot be used to buy goods or services, or otherwise provide any benefit in the marketplace other than reselling it at a later time for more than it was purchased for by the original investor.

98.    As explained above, Ripple began its efforts by attempting to increase speculative demand and trading volume for XRP though, at first, it did not articulate a single specific strategy about which type of entities or persons it would target to encourage adoption of XRP for any particular non-investment use. At the time XRP began to be sold, it did not have any real, functional use beyond being a speculative investment.

99.    Starting in at least 2015 (years after XRP had begun to be distributed/sold to investors), however, Ripple decided that it would seek to make XRP a "universal [digital] asset" for banks and other financial institutions to effect money transfers.  That proposed use has never meaningfully materialized.

100.    On June 21, 2018, Garlinghouse explained in a public speech that XRP was not being used to effect cross-border transactions as of that date.

101.    According to Ripple's plans, to create acceptance for the universal digital asset, Ripple first had to create an active, liquid XRP secondary trading market. It therefore continued its efforts to develop a use for XRP while increasing sales of XRP into the market. Under the plan, a future "user" of XRP as a universal asset (i.e., a bank) would use the speculative trading market to effect money transfers.

102.    In other words, Ripple's stated business plan made Ripple's conduct alleged here a foregone conclusion—Ripple made it part of its "strategy" to sell XRP to as many speculative investors as possible. While Ripple touted the potential future use of XRP by certain specialized institutions, a potential use it would deploy investor funds to try to create, Ripple sold XRP widely into the market, specifically to individuals who had no "use" for XRP as Ripple has described such potential "uses" and for the most part when no such uses even existed.

103.    Ripple also lacked the funds to pay for these endeavors and for its general corporate business expenses.

104.    Ripple's objectives and its own financial reality thus compelled it to actively seek to offer and sell XRP as widely as possible, while controlling supply and demand in the resale market to manage and control liquidity for an imagined, future "use" case.

105.    To increase sales of XRP on the open market, Ripple has also directed all readers of its website to information about "How to Buy XRP" and has provided a list of digital asset trading platforms on which investors can make those purchases.

106.    XRP does not have any meaningful functional use or utility in its present form.  It is simply a speculative asset sold to investors, which investors purchase for the purpose of earning a profit.

107.    XRP is not a currency, as it cannot be exchanged for goods and services.  Further, there is no correlation between the purchase price of XRP and the market price of goods or services that can be purchased in exchange for XRP tokens.  XRP has not been adopted or used in any meaningful way except as a speculative asset.

108.    Further, any claim by Ripple of a functional use for XRP is belied by the economic reality of how most of the XRP in existence is used.  Indeed, Ripple itself holds the majority of XRP that is not used for anything other than future sale of the same to investors.  The vast majority of XRP in circulation is used for investment purposes, and not for any functional use.

**F.  The Ripple Defendants Control The XRP Trading Markets**

109.    The Ripple Defendants' offers and sales of XRP occurred into a market that they had largely created and which—consistent with their dual purposes of raising funds from their XRP sales and managing the liquidity of the XRP market—they played a significant role overseeing.

24

110.    The Ripple Defendants' efforts in this regard principally involved monitoring the timing and amount of their XRP sales and purchases, sometimes to coincide with strategic announcements about Ripple or XRP, and establishing an escrow for Ripple's own XRP holdings.

111.    The ability to sell investments in liquid markets is an important consideration for investors when determining whether to buy securities because it represents one way in which they can realize profits from their investments.

### 1.  Ripple Managed The Price And Liquidity In The XRP Market

112.    Throughout the relevant time period, Ripple undertook significant efforts to monitor, manage, and impact the XRP trading markets, including the trading price and volume of XRP.

113.    This included, among other strategies, paying digital asset trading platforms to permit XRP trading.

114.    These efforts also included timing the prices and amounts of XRP sales to achieve what Ripple viewed as desirable trading volume or price levels and fluctuations with respect to XRP. Ripple sought to maximize the amount it could earn from the XRP sales while minimizing volatility and any downward pressure on XRP's market price caused by Ripple's constant injections of new XRP into the market to raise operating funds.

115.    According to the SEC, Ripple internally described these strategies as aimed at maximizing the amount of money Ripple could raise in selling XRP or at achieving "more speculative [XRP] volume."  Ripple had an internal "XRP Markets Team" that monitored XRP's price and volume daily and regularly communicated with Ripple's XRP market makers about Ripple's XRP sales strategy, which relied on selling XRP in amounts no greater than a certain percentage of XRP's daily volume, generally between 10 and 25 basis points.

116.    Starting in 2017 at the latest, Garlinghouse and other representatives participated in meetings with, or were apprised of discussions by, the XRP Markets Team, in which they discussed adjustments to Ripple's sales strategy and recommendations regarding the amount of Ripple's XRP to sell, decisions over which Garlinghouse had final authority as Ripple's CEO.

117.    Upon information and belief and according to the SEC, internally, Ripple executives frequently expressed concern over XRP's price and planned proactive steps to protect the market.  For example, in an August 12, 2017 internal e-mail, Garlinghouse raised concerns about XRP being "squarely left out" of a recent market "rally" and asked whether Ripple's recent XRP sales were "impacting the market?" He instructed certain Ripple employees to "proactively" attempt to increase speculative trading value with positive XRP news.

118.     Also according to the SEC, in September 2019, Ripple's "Head of Global Institutional Markets" reminded certain Ripple employees that Ripple viewed itself as "Responsible Stewards of XRP." She expressed concerns about the impact on XRP's price from increased XRP supply and recommended "buy[ing] [XRP] back" because she was very "worried about xrp at 0.20" and was "DREAD[ING]" an upcoming report—referring to quarterly reports Ripple began publishing in January 2017 (the "Markets Reports")—if Ripple didn't "take swift, creative action now (!)"

119.    The Ripple Defendants did not disclose publicly this XRP buying and selling strategy.

120.    But Ripple did publicly tout other actions it was taking to support XRP's market price, including to limit XRP supply or to create scarcity through XRP buybacks.  Defendant Garlinghouse approved the "buy back" option.

121.    Following Garlinghouse's decision, Ripple disclosed on November 5, 2020, in its Markets Report for the third quarter of 2020, that it had purchased $45 million worth of XRP in

order to "support healthy markets" and that it may continue to engage in this activity in the future.

122.    In its Market Report for the fourth quarter of 2017, Ripple told investors that it placed sales volume "restrictions" on the XRP it sold directly to financial institutions to "mitigate the risk of market instability due to potential subsequent large sales."

**2.    XRP Escrow**

123.    XRP investors became concerned that Ripple's sales could cause XRP's price to crash. According to the SEC, Defendant Garlinghouse explained in an internal email on May 16, 2017, XRP investors were concerned that Ripple could "sell its [then] 61.68[ ]B[illion] XRP in the market at any time."  Generally, that Ripple could flood the market at any time with XRP caused investor concern.

124.    To assuage investor concerns, on May 16, 2017, Ripple announced that it would place 55 billion XRP (most of its current holdings) into a cryptographically-secured escrow that would restrict Ripple to accessing only one billion XRP every month (the "XRP Escrow").

125.    Defendant Garlinghouse played a role in the formation of the XRP Escrow by playing a role in developing and approving the idea.

126.    The SEC states that an internal Ripple memo explained that one purpose of the escrow was to "secur[e] speculative liquidity" in XRP and to "drive a material increase in XRP trading volume/liquidity" by removing uncertainty about when Ripple might dispose of its XRP holdings.  The creation of the XRP Escrow was designed to solicit investors to continue to purchase XRP as a speculative investment vehicle.

127.    Ripple and Garlinghouse publicly touted the formation of the XRP Escrow as proof that Ripple and XRP holders shared a common interest in the success of Ripple's efforts as to XRP and as one of Ripple's many efforts to manage the trading market for XRP.

128.    In other words, by announcing the XRP Escrow, Defendants sought to encourage investors to buy and sell XRP without fear that Ripple could cause XRP's price to crash—as though the XRP market was a functional market subject to ordinary supply and demand independent of the issuer. In doing so, Defendants reminded investors of a fact they already knew—that Ripple was committed to undertaking efforts to increase XRP trading volume while supporting XRP's price.

129.    Ripple publicized the XRP Escrow to investors through Twitter and other online sources for the purpose of soliciting further investment into XRP.

**G. Garlinghouse's Sale Of XRP**

130.    From April 2015 to the present, Garlinghouse was either the COO or the CEO of Ripple and thus part of the control group of XRP's issuer.

131.    After Garlinghouse joined Ripple in 2015, Garlinghouse was awarded XRP from Ripple, aligning his financial incentives with Ripple's. Garlinghouse later resold significant quantities of XRP to amass profits well over one hundred million dollars.

132.    The following sales took place with Garlinghouse working in coordination with Ripple to develop and maintain a liquid XRP market that the Defendants could monetize.

133.    From April 2017 through December 2019, Garlinghouse sold over 321 million of his XRP, for approximately $150 million, to the public through digital asset trading platforms or other intermediaries.

134.    Garlinghouse offered and sold XRP to investors all over the world, including in the United States, without marketing or restricting offers or sales to persons who had a "use" for XRP and without restricting purchasers from reselling their XRP to other investors, including to investors in the United States or elsewhere.

135.    Garlinghouse directed his offers and sales of XRP from within the United States.

136.    At various times between April 2017 and at least December 2019, Garlinghouse also paused his XRP sales because XRP's market price was falling, seeking to avoid driving down XRP's market price.

**H.  XRP Is, And Has At All Relevant Times Been, A Security Under Florida (And Federal) Law**

137.    "[T]he Florida Securities and Investor Protection Act [(the "Act")] is patterned after federal securities law."  *Githler v. Grande*, 289 So. 3d 533, 539 (Fla. Dist. Ct. App. 2019).

138.    Specifically, the Act's definition of "security" in Fla. Stat. Ann. § 517.021(22) is modeled after Section 2(a)(1) of the Securities Act.

139.    Under the Act, one form of a "security" is an "investment contract."  Fla. Stat. Ann. § 517.021(22)(q).

140.    While "investment contract" is not defined in the Act, Florida courts apply the Supreme Court's *Howey* test, as articulated in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244, 1249 (1946).  *See, e.g., Farag v. Nat'l Databank Subscriptions, Inc.*, 448 So. 2d 1098, 1100 (Fla. Dist. Ct. App. 1984) ("Although 'investment contract' is not defined in the Florida Securities Act, the United States Supreme Court, by definition, has established a three-pronged test which must be met in order to prove the existence of an investment contract . . ."); *see also id.* at 1101 ("Florida courts have adopted the *Howey* definition" of the term "investment contract").

141.     The *Howey* test has three prongs:  "First, there must be an investment of money; second, the investment must be in a common enterprise; and third, there must be an expectation of profits to be derived solely from the efforts of another."  *Id.* at 1100-01.

142.     The *Howey* test is not designed to be rigidly applied; instead, the Supreme Court made clear in its *Howey* decision that the definition of whether an instrument is an investment contract and therefore a security is a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

143.     XRP meets each element of the *Howey* test.  At all relevant times, XRP was an investment contract and therefore a security subject to the registration requirements under Florida law (and by extension federal law, as the standards are identical).

144.     The following analysis is informed by the fact that the SEC itself considers XRP a security, as it has brought suit against the Ripple Defendants for selling an unregistered security in violation of federal securities laws.  *See* Ex. A.

**1.  Plaintiffs and Class Members Invested Money**

145.     The first prong is straightforward.  As alleged above, Plaintiffs paid fiat money and/or traded other digital currencies to purchase their XRP, as did members of the Classes (defined below).

146.     There is no dispute that the Ripple Defendants sell XRP on the open market, including through cryptocurrency exchanges.  There is also no dispute that Crypto.com and Kraken listed XRP for sale on their respective platforms.

147.    Plaintiffs purchased their XRP through cryptocurrency exchanges, to wit Crypto.com (Toomey) and Kraken (Sergalis).  They invested money or other cryptocurrencies in order to purchase XRP.

## 2.    The Investment Of Money Was In A Common Enterprise

148.    The SEC has published a framework for evaluating whether a digital asset constitutes a security under the *Howey* test.[20]

149.    The SEC explained that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."[21]  This is because "investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[22]

150.    Here, the prospective profits of Plaintiffs and Class members depend on the success of Ripple.  Indeed, Ripple itself acknowledges that the success of XRP and the success of Ripple are intertwined.  For example, on September 11, 2017, Defendant Garlinghouse stated in an interview with CNBC: "People are looking at the success Ripple has been having as a company, and I think that's increased the value of XRP."

151.    Further, as XRP is a "native coin" on the XRP Ledger, its success is tied to the success of the XRP Ledger, which is in turn tied to the success of Ripple as an entity.

152.    In short, investors who purchased XRP invested into a common enterprise with other XRP purchasers, as well as with Ripple.

153.    Because XRP is fungible, the fortunes of XRP purchasers were and are tied to one another, and each depend on the success of Ripple's XRP strategy. In other words, Ripple's

---

[20] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last visited 1/19/21).

[21] *Id.*

[22] *Id.*

success or failure in propelling trading of XRP drives demand for XRP, which will dictate investors' profits (recognized in increased prices at which they could sell XRP) or losses.

154.    XRP investors stand to profit equally if XRP's popularity and price increase, and no investor will be entitled to a higher proportion of price increases. In other words, the price of XRP rises and falls for XRP investors together and equally for all investors.

155.    Moreover, Ripple pooled the funds it raised in the sale of XRP and used them to fund its operations, including to finance building out potential "use" cases for XRP, paying others to assist it in developing a "use" case, constructing the digital platform it promoted, and compensating executives recruited for these purposes. Ripple did not segregate or separately manage proceeds from different XRP purchasers. The nature of XRP itself made it the common thread among Ripple, its management, and all other XRP holders.

156.    The Ripple Defendants recognized and repeatedly emphasized these common interests to prospective investors, including by explaining to the market that Ripple used proceeds from XRP sales to fund its operations and that Ripple wanted XRP to succeed.

157.    In a 2014 promotional document, Ripple explained its "plans to retain 25% of all XRP issued to fund operations (and hopefully turn a profit)."

158.    From at least 2014 through at least 2017, Ripple made a similar representation in the Ripple Wiki: "Ripple Labs sells XRP to fund its operations and promote the network. This allows Ripple Labs to have a spectacularly skilled team to develope [sic] and promote the Ripple protocol."

159.    Ripple also made clear that the common interest was not just any interest, but a specific interest in XRP's price increasing, as Ripple's (significant) XRP holdings were essentially its only asset.

160.    Garlinghouse in particular frequently encouraged investors to view their economic interests as aligned with Ripple's.  On January 17, 2018, Garlinghouse tweeted an article discussing Ripple's remaining supply of XRP. Garlinghouse's tweet noted that Ripple was not selling all of its remaining XRP supply, and that the article was "[a] good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."  Again, these public statements amounted to solicitations to investors to continue to invest money into XRP.

161.    Similarly, on March 7, 2018 in a CNBC interview, Garlinghouse stated: "There's no party more interested in the success of the XRP ecosystem than Ripple. We want that to be massively successful because we own a lot of XRP."

162.    Ripple has made clear on its website that it holds at least 54 billion XRP, making it by far the largest single holder of the asset.

### 3.    Investors Had An Expectation Of Profits Derived From Defendants' Efforts

163.    Ripple led investors to reasonably expect that they could reap a profit from their investment into XRP, derived from Ripple's and its agents' efforts into their common enterprise. Ripple did so by, among other things, stating that Ripple's efforts sought to increase "demand" for XRP; assuring investors that Ripple would take steps to protect the market for XRP, including by fostering a readily available XRP trading market; highlighting XRP price increases and at times tying them to Ripple's efforts; and selling XRP to certain institutional investors at discounted prices.

164.    Ripple made many of these statements in its Markets Reports, which typically included a segment entitled "Market Commentary" for XRP, in which Ripple highlighted XRP price increases and at times sought to persuade investors that Ripple's efforts lay behind such rallies.

165. Throughout the relevant time period, Defendants repeatedly told investors that Ripple's XRP-related efforts were meant to spur "demand" for XRP. Ripple at times even explicitly tied the hope for an increase in demand to what any reasonable investor would understand an increase in demand to entail: an increase in XRP's market price.

166. Ripple made other such statements encouraging investors to expect to profit from Ripple's efforts to create institutional demand for XRP. For example, in response to questions about XRP's declining market price during a March 14, 2018 interview, Garlinghouse explained that, if Ripple was "successful in building out the project of xCurrent and expanding the number of users around xRapid, the price of XRP will take care of itself over a 3 to 5 year period."

167. Ripple sought to assure investors that they could trust Ripple to protect the XRP trading markets. Ripple repeatedly stated that it expected its XRP "distribution strategies" to strengthen its price vis-à-vis other assets and told investors it was establishing the XRP Escrow to remove uncertainty over the supply of XRP in the market (which Ripple viewed as depressing XRP's price). As Garlinghouse explained in a December 14, 2017 interview posted on Ripple's official YouTube channel, Ripple established the XRP Escrow to "remove the perception that there's a risk" regarding XRP's supply, and "[t]he market reacted well to that."

168. Related to Ripple's touting of its efforts to protect the trading markets for XRP, Ripple touted the ability of investors to buy and sell XRP on digital asset trading platforms (none of which had anything to do with "using" XRP in any way other than as a speculative vehicle).

169. Ripple undertook extensive efforts—starting in at least late 2015—to persuade digital asset trading companies to permit investors to buy and sell XRP on their platforms, especially those that would make XRP tradable against the USD.

170.    Ripple itself publicly noted the importance of XRP being traded on digital asset trading platforms. In articles published on its website on December 21, 2017 and January 18, 2018, Ripple noted: "[I]t's a top priority for Ripple to have XRP listed on top digital asset exchanges. . . . Ripple has dedicated resources to the initiatives so you can expect ongoing progress."  This was part of the Ripple Defendants' efforts to solicit investors to purchase XRP through digital asset trading platforms.

171.    Ripple and Garlinghouse also encouraged reasonable investors to view the purchase of XRP as something from which they could profit by persistently touting increases in XRP's price.

172.    On March 24, 2017, Ripple tweeted: "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."

173.    On May 3, 2017, Ripple tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last two months' via @Nasdaq."

174.    On June 29, 2017, Ripple tweeted a clip of an interview Garlinghouse gave on CNBC with the caption: "#XRP – up 4000% this year – has shown the market favors a real use case for #digitalassets." Garlinghouse also predicted that "digital assets broadly are in a position to be more useful than gold as a value transfer" and described XRP as "solving a real-world use case."

175.    In the Markets Report for the third quarter of 2017, published October 19, 2017, Ripple touted the fact that anticipation surrounding Ripple's annual conference "had spurred a meaningful spike in XRP" and that this rise in price lacked any "corresponding rally in [bitcoin] and [the digital asset referred to as ETH]," noting that XRP's price was "at times overwhelmingly independent" from that of bitcoin and ETH.

176.    On December 7, 2017, when the XRP Escrow began, Ripple tweeted: "55B $XRP is now in escrow. Interested in what this means for $XRP markets?" Garlinghouse similarly tweeted: "Boom! 55B $XRP now in escrow. Good for supply predictability and trusted, healthy $XRP markets. Glad to finally let this #cryptokitty out of the bag!"

177.    Ripple did not limit its touting of XRP purchases as a potential means for investors to profit only to increases in XRP prices in the abstract. Frequently, Ripple explicitly tied actual or potential XRP investment returns to Ripple's completed or upcoming efforts—both with respect to developing demand for XRP and to protecting the XRP markets themselves.

178.    In connection with a significant rise in the price of XRP on March 23, 2017, Ripple explained in the Markets Report for the first quarter of 2017 that "key [Ripple] developments may have had an impact[,]" including statements by Ripple "about its commitment to XRP and the Ripple Consensus Ledger (RCL) as part of its long-term strategy."

179.    In the Markets Report for the second quarter of 2017, Ripple noted that various "XRP developments," including the XRP Escrow, were "instrumental in helping to drive XRP interest and volume," and highlighted Ripple's "clear plans . . . to address top concerns about XRP" in the following quarter. Ripple also stated that "[t]here were a number of significant announcements and events which clearly contributed to XRP's incredible second quarter," reflected by a "stunning QoQ [price] increase of 1[,]159%" and "YTD [year to date] growth of 3[,]977%."

180.    Garlinghouse himself was a particularly persistent spokesperson for Ripple's efforts to market XRP as an investment from which investors could potentially profit. While he was selling millions of XRP, Garlinghouse frequently told investors that he was invested in XRP,

36

and that he was bullish on the investment. As XRP's price fluctuated, he also encouraged investors to be patient and look at the price of XRP on a longer time horizon.

181.    In a September 11, 2017 interview on CNBC, Garlinghouse noted Ripple's supposed success as a company and stated: "I think that's increased the value of XRP."  The following month, during an October 18, 2017, question-and-answer session at a Ripple-sponsored conference, which was posted on Ripple's YouTube channel, Garlinghouse repeated a statement he repeated frequently in similar terms: that he was "not focused on the price of XRP over 3 days, or 3 weeks, or 3 months" but, rather, "over 3 years and five years." He also stated, in response to a question about XRP's price, that he had "no qualms saying definitively if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP, because we're solving a multi-trillion-dollar problem."

182.    Similarly, in a November 2017 interview with CNBC, Garlinghouse noted: "On a personal basis, I'm long BTC, Bitcoin. I guess technically I'm long Bitcoin Cash. But I'm also long XRP." He repeated the sentiment the following month, in a December 14, 2017 interview with Bloomberg News. When asked if he invested in XRP, he said: "I'm long XRP, I'm very, very long XRP as a percentage of my personal . . . balance sheet" (though he had already sold significant XRP). Later, he reiterated, "I remain very, very, very long XRP, . . . I'm on the HODL side[.]"

183.    In a March 12, 2018 interview with Bloomberg News, Garlinghouse, noting the potential market capitalization of XRP into the trillions of dollars, stated: "[W]e have found that part of the reason why XRP has performed well, is because people realize. . . if we work with the system to solve this problem and we can solve that problem at scale, a problem measured in the trillions of dollars, then there is a lot of opportunity to create value in XRP." Garlinghouse also

speculated in the December 14, 2017 interview that, if a company created "utility" for a digital asset like XRP, "then there will be demand for the tokens, [and] the price of the tokens will go up."

184. As these public statements show, speculative investment in XRP was precisely what Ripple wanted and promoted—it needed speculative investment for its own stated strategy to be successful and to increase the value of and monetize its XRP holdings.

185. The very nature of XRP in the market—as constructed and promoted by Ripple—compels reasonable XRP purchasers to view XRP as an investment.

186. Except for certain trading volume limitations, XRP is freely transferable or tradeable without restrictions the moment it is purchased, and it was offered broadly and widely to all potential purchasers, not just those who might be reasonably expected to "use" XRP.

187. Market participants, when they buy XRP, are speculating that Ripple's economic incentives and its promises with respect to XRP will lead it to successfully solve the "trillion-dollar problem" that will increase demand for XRP.

188. Plaintiffs and members of the Classes play a passive role as to the success of Ripple, the XRP Ledger, and XRP. The success of Ripple and the XRP Ledger are dependent on Defendants' managerial efforts.

**I. Defendants Did Not Register With The SEC Or Florida Regulators**

189. At no time did the Ripple Defendants make the required securities registration with the Florida Office of Financial Regulation or any other Florida regulators.

190. Similarly, according to the SEC itself, The Ripple "Defendants have never filed a registration statement with the SEC with respect to any XRP they have offered or sold or intend

to offer or sell, and no registration statement has ever been in effect with respect to any offers or sales of XRP."[23]

191.    Because the Ripple Defendants failed to register the XRP offering with Florida regulators, liability for the sale of XRP to investors is automatic.  *See Skurnick v. Ainsworth*, 591 So. 2d 904, 906 (Fla. 1991) ("The intent of section 517.12 is to protect purchasers and, if that section has been violated, damages are automatic in accordance with the provisions of section 517.211.").

### J.  The Ripple Defendants Represent To Investors That XRP Is Not A Security, When In Fact It Is

192.    On numerous occasions, Defendants made public statements claiming that XRP was not a security, when in fact it is.

193.    For example, on or around April 11, 2018, Ripple's Chief Market Strategist, Cory Johnson, told CNBC: "We absolutely are not a security. We don't meet the standards for what a security is based on the history of court law."  Mr. Johnson also said, "Coinbase never ever raised the issue of whether or not XRP is a security in our discussions about listing XRP. We're 100 percent clear, it's not a security. We don't meet the standards."[24]

194.    Defendant Garlinghouse has similarly publicly represented that XRP is not a security.[25]

---

[23] Ex. A at ¶ 367.
[24] CNBC, Ripple says its cryptocurrency XRP is not a security (Apr. 12, 2018), https://www.cnbc.com/2018/04/12/ripple-says-its-cryptocurrency-xrp-is-not-a-security.html. (last visited 1/25/21).
[25] Daniel Roberts, Ripple CEO: 3 reasons XRP token is not a security, Yahoo Finance (Jun. 21, 2018), https://finance.yahoo.com/news/ripple-ceo-3-reasons-xrp-token-not-security-181455786.html (last visited 1/25/21).

**K.  The SEC Action**

195.    As mentioned above, on December 22, 2020, the SEC has filed a lawsuit against Defendants in the Southern District of New York, alleging that Defendants' sale of XRP violated federal securities laws.

196.    Specifically, the SEC alleges that XRP is an unregistered security because it is an "investment contract."

197.    The SEC alleges not only that XRP was an investment contract, but also that Defendants *knew* their sale of XRP constituted an illegal offering before ever selling XRP, but that Defendants persisted in selling it nonetheless.  Specifically, according to the SEC, Ripple received legal advice that XRP could be a security and could require registration.[26]

**L.  XRP Is Delisted By Major Exchanges**

198.    After the SEC filed its lawsuit, several cryptocurrency exchange platforms delisted XRP or made plans to delist XRP.

199.    For example, Coinbase, Binance.US, OkCoin, and most recently Blockchain.com all recently announced that XRP would be delisted.

200.    Others have followed, Defendant Kraken, another exchange platform, also recently announced it would delist XRP in the wake of the SEC's lawsuit.[27]

201.    Defendant Crypto.com has also announced that it will delist XRP.[28]

202.    The delisting of XRP is an implicit recognition that XRP is in fact a security.

---

[26] *See, e.g., id.* at ¶ 3; *id.* at ¶ 4 ("Ripple [. . .] ignored this advice and instead elected to assume the risk of initiating a large-scale distribution of XRP without registration.").

[27] https://coingape.com/kaken-delists-xrp-blackrock-sells-major-stake/ (last visited 1/19/21).

[28] https://www.coindesk.com/crypto-com-to-delist-suspend-xrp-in-the-us-after-secs-ripple-suit (last visited 1/19/21).

### M. Crypto.com's Listing Of XRP

203.    On or around October 3, 2018, Crypto.com announced that it added XRP to the Crypro.com Wallet and Card applications.[29]

204.    Crypto.com stated that its listing of XRP "supports Crypto.com's mission to accelerate the world's transition to cryptocurrency. Crypto.com carefully reviews and evaluates cryptocurrencies on an ongoing basis for inclusion in its Wallet app."[30]

205.    Crypto.com offered XRP for purchase on its application despite the fact that XRP is an unregistered security.

206.    Crypto.com is not, and was not during the relevant time period, a registered securities broker or exchange.

207.    Further, Crypto.com charges fees to consumers for trades, including trades in XRP.  These are known as maker and taker fees.[31]  Plaintiff Toomey and Class members paid these fees to trade XRP on Crypto.com.

208.    On December 29, 2020, Crypto.com announced that would be delisting XRP from the Crypto.com app as of January 19, 2021.[32]

### N. Kraken's Listing Of XRP

209.    Kraken has listed XRP on its platform for investors to purchase for years.

210.    Indeed, not only did Kraken offer XRP for purchase, but it specifically advertised XRP to its customers as a viable investment vehicle.  Specifically, Kraken's website included

---

[29] https://www.prnewswire.com/news-releases/ripple-s-xrp-added-to-crypto-com-s-wallet-amp-card-app-815945737.html (last visited 3/22/21).
[30] *Id.*
[31] https://crypto.com/exchange/document/fees-limits (last visited 3/22/21).
[32] https://blog.crypto.com/xrp-delisting-from-the-crypto-com-app-in-the-u-s/ (last visited 3/22/21).

pages entitled "What is Ripple? (XRP)"[33] and "How to Buy Ripple (XRP)"[34] which touted XRP and then solicited investors to purchase XRP through the Kraken platform.

211.    Kraken is not, and was not during the relevant time period, a registered securities broker or exchange.

212.    Following the SEC lawsuit, Kraken elected to halt trading of XRP beginning January 29, 2021.[35]  Kraken noted that it is "monitoring the situation regarding the SEC's filing and will adapt according to any new developments."[36]

213.    After announcing the decision, Kraken's CEO Jesse Powell stated that XRP "presents a 'huge asymmetrical risk' for exchanges after affiliated blockchain company Ripple got sued by the U.S. Securities and Exchange Commission in late December."[37]  It is a huge asymmetrical risk because Kraken (like it's counterpart Crypto.com) was 1) participating in the sale of unregistered securities; 2) acting as an unregistered securities broker; and 3) operating as an unregistered exchange.  All in violation of federal securities laws.

## CLASS ALLEGATIONS

214.    Plaintiffs seek to represent a class defined as all persons or entities in the State of Florida who purchased XRP (the "Class").

215.    Plaintiff Toomey also seeks to represent a class defined as all persons or entities who purchased XRP through Crypto.com (the "Crypto.com Class").  Plaintiff Toomey also seeks

---

[33] https://www.kraken.com/learn/what-is-ripple-xrp/ (last visited 3/22/21).
[34] https://www.kraken.com/en-us/learn/buy-ripple-xrp (last visited 3/22/21).
[35] https://blog.kraken.com/post/7450/kraken-to-halt-xrp-trading-for-u-s-residents/ (last visited 3/22/21).
[36] *Id.*
[37] https://coinmarketcap.com/headlines/news/xrp-presents-huge-risk-to-exchanges-says-kraken-ceo/ (last visited 3/22/21)

to represent a subclass of all persons or entities in the State of Florida who purchased XRP through Crypto.com (the "Crypto.com Subclass").

216.    Plaintiff Sergalis also seeks to represent a class defined as all persons or entities who purchased XRP through Kraken (the "Kraken Class").  Plaintiff Sergalis also seeks to represent a subclass of all persons or entities in the State of Florida who purchased XRP through Kraken (the "Kraken Subclass").

217.    The Class, the Crypto.com Class, the Crypto.com Subclass, the Kraken Class, and the Kraken Subclass are collectively referred to as the "Classes."

218.    Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

219.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Classes may be expanded or narrowed by amendment or amended complaint.

220.    **Numerosity.**  The members of the Classes are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are tens of thousands of members in the Classes based on the volume of Defendants' sales of XRP.  Although the precise number of Class members is unknown to Plaintiffs, the true number of members in the Classes are known by Defendants and/or third-party entities that participated in the sale of XRP.  The Classes are ascertainable and identifiable, and members of the Classes may

be identified through Defendants' databases, the XRP Ledger, and cryptocurrency exchange databases. Class members may be notified of the pendency of this action by U.S. Mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

221. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether XRP is an unregistered security under Florida (and federal) law;

(b) whether the Ripple Defendants registered with federal or Florida regulators prior to selling XRP to Florida investors;

(c) whether Crypto.com operated as an unregistered securities broker and/or exchange;

(d) whether Kraken operated as an unregistered securities broker and/or exchange;

(e) whether Defendants' conduct violated the Florida Deceptive and Unfair Trade Practices Act;

(f) whether the Ripple Defendants fraudulently and/or negligently misrepresented the nature of XRP to Plaintiffs and Class members;

(g) whether Defendants are liable to Plaintiffs and the Classes for unjust enrichment and/or money had and received; and

(h) the type and measure of damages suffered by Plaintiffs and the Class.

222. **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Classes in that Plaintiffs purchased XRP from Defendants or third-party exchanges. XRP was an unregistered security throughout the class period and effected each purchaser identically. Plaintiffs' claims are typical in that both Plaintiffs and members of the Classes were uniformly

harmed in purchasing XRP from Defendants.   Further, there are no defenses available to Defendants that are unique to Plaintiffs.

223.   **Adequacy of Representation.**   Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained counsel that are highly experienced in complex class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Classes.

224.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

225.   In the alternative, the Classes may also be certified because:

(a)     the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

    (b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    (c)    Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## COUNT I
### Violation Of The Florida Securities And Investor Protection Act
### (On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)

226.    Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.

227.    Section 517.07 of the Act provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security ... is registered pursuant to this chapter." Fla. Stat. § 517.07(1).

228.    In turn, Section 517.211 provides that "[e]ach person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser" of the unregistered security. Fla. Stat. Ann. § 517.211.

229.    "The definition of 'seller' under section 517.211. Florida Statutes, has been expanded to include those who solicit the sale of securities." *Hilliard v. Black*, 125 F. Supp. 2d 1071, 1083 (N.D. Fla. 2000).

230.    In order to prevail on a claim of an unregistered sale under the Act, Plaintiffs must establish that "(1) [the] contracts sold by [Defendants] were securities; (2) these securities were

not registered with the State of Florida; and (3) Defendants sold such unregistered securities." *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1350 (S.D. Fla. 2019).

231.    As explained above at paragraphs 137-188, XRPs are securities within the meaning of Florida law because they qualify as an "investment contract" under the *Howey* test.

232.    Also as explained at length above, the Ripple Defendants are "sellers" of XRP. XRP was issued by Ripple and sold by Ripple, XRP II, LLC, and Bradley Garlinghouse.

233.    Further, the Ripple Defendants are "sellers" of XRP because they actively solicited the sale of XRP for their own financial interest and for the financial interest of XRP owners.  As set forth at length above, the Ripple Defendants made public statements and consistently touted XRP as a lucrative investment vehicle (see, for example, paragraphs 51-61, 112-136, *supra*).  The Ripple Defendants had a financial interest in soliciting purchases of XRP (whether directly from the Ripple Defendants or in secondary trading markets) because maintaining investor demand for XRP was critical to its twin goals of creating a market for XRP and monetizing its holdings of XRP to fund its operations.

234.    The Ripple Defendants did not register with the Florida Office of Financial Regulation (or any other appropriate agency) prior to making the offering of XRP available to investors, and were not otherwise exempt from registration.

235.    The Ripple Defendants sold XRP, unregistered securities, to Plaintiff and Class members either directly or through soliciting purchase of XRP.  As discussed in paragraphs 20-21, above, Plaintiffs reviewed information regarding XRP promulgated by the Ripple Defendants and/or agents and affiliates of the Ripple Defendants touting XRP as a viable investment vehicle. After reviewing this information, Plaintiffs elected to invest in and purchase XRP based on the Ripple Defendants' solicitations.

236.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the Class have suffered damages in connection with their purchases of XRP.  As a result of Defendants' sale, Plaintiffs hereby demand, on behalf of themselves and the Class, damages as prescribed in Fla. Stat. Ann. § 517.211, including reasonable attorneys' fees and costs.

## COUNT II
### Violation of Florida's Deceptive and Unfair Trade Practices Act
### (On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)

237.    Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.  Plaintiffs also incorporate by reference the allegations in Count I as it relates to the *per se* violations of FDUPTA alleged herein.

238.    FDUPTA protects "the consuming public and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.212(2).

239.    Plaintiff and Class members are "consumers" within the meaning of FDUPTA. Fla. Stat. Ann. § 501.203(7) (" 'Consumer' means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.")

240.    By soliciting investor funds in exchange for XRP as described in detail above, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

241.    FDUPTA can be violated in two ways, both of which are relevant to this case. First, the Ripple Defendants have committed a "traditional" violation of FDUPTA by engaging in unfair and/or deceptive acts and practices which caused injury to Plaintiffs and Class members.  Second, Defendants have committed a *per se* violation of FDUPTA by virtue of their violation of The Florida Securities And Investor Protection Act, which is a statute designed for consumer protection and proscribes unfair methods of competition and deceptive acts and practices.  Fla. Stat. Ann. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.").

242.    While FDUTA does not define "deceptive" or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance.  "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted).  Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers. *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016). Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

243.    Through the conduct described in the Nature Of The Action Section and Facts Common To All Claims section of this Complaint, paragraph 20-21, and as set forth in Count I,

*supra*, the Ripple Defendants have engaged in deceptive acts and deceptive trade practices by selling XRP to investors while failing to disclose the true nature of XRP to Plaintiffs and the Class, the sale of which required full and fair disclosure to consumers as well as registration with Florida regulators.  By failing to file a registration statement in accordance with the Act and federal law, the Ripple Defendants materially omitted information about XRP that an investor would otherwise be apprised of had a proper registration statement been made.  The Ripple Defendants also misrepresented and/or omitted the nature of XRP to Plaintiffs and Class members, specifically by affirmatively stating that XRP is not a security and by failing to disclose its true nature as a security at or before the time of sale.

244.    Through the conduct described in the Nature Of The Action Section and Facts Common To All Claims section of this Complaint, paragraph 20-21, and as set forth in Count I, *supra*, the Ripple Defendants engaged in unfair trade practices by failing to register XRP in accordance with the Act and federal law, thereby violating Florida's public policy, and otherwise engaged in unscrupulous conduct that caused injury to Plaintiffs and Class members.

245.    Through the conduct described in the Nature Of The Action Section and Facts Common To All Claims section of this Complaint, paragraph 20-21, and as set forth in Count I, *supra*, the Ripple Defendants have engaged in *per se* violations of FDUPTA by violating the Florida Securities And Investor Protection Act as well as federal securities laws.

246.    The Ripple Defendants caused injury to Plaintiffs and Class members because the Ripple Defendants' actions caused Plaintiffs and Class members to lose substantial sums of money by investing in the unregistered security XRP, and because the Ripple Defendants' actions induced Plaintiffs and Class members to purchase XRP.  Plaintiffs and Class members suffered a substantial loss proximately caused by Defendants' conduct.

247.   Plaintiffs and Class members suffered actual damages as a result of the Ripple Defendants' conduct, as set forth in paragraphs 20-21, *supra*, as well as the general allegations contained herein regarding harm to the Class as a whole.

248.   Accordingly, Defendants are liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees and costs.  Plaintiffs also seek injunctive relief proscribing further unregistered sales of XRP.

### COUNT III
**Fraudulent Misrepresentation/Omission**
**(On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)**

249.   Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.

250.   The Ripple Defendants made false statements and/or omissions regarding material facts related to the true nature of XRP.  Specifically, the Ripple Defendants knew that XRP was in fact a security, but affirmatively misrepresented to investors that it was not a security.  The Ripple Defendants knew XRP was a security before Defendants sold XRP into the market.  For example, according to the SEC, the Ripple Defendants received legal advice before selling XRP that XRP was a security, but the Ripple Defendants proceeded to offer XRP for sale to investors without registering with Florida (or federal) regulators or disclosing that XRP was a security to investors.  The Ripple Defendants actively concealed from investors the true nature of XRP.

251.   The Ripple Defendants intended for investors to rely on their misrepresentations and omissions, and to act on them by investing in XRP tokens.

252.   Plaintiffs and Class members relied on the Ripple Defendants' misrepresentations and omissions, and had Plaintiffs and Class members known that XRP was in fact an

unregistered security, they would have been aware of that fact and would not have purchased XRP.

253.    Plaintiffs and Class members suffered injury and actual damages by investing in XRP in reliance on Defendants' misrepresentations and omissions.

## COUNT IV
### Negligent Misrepresentation/Omission
### (On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)

254.    Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.

255.    The Ripple Defendants made false statements and/or omissions regarding material facts related to the true nature of XRP.  Specifically, the Ripple Defendants knew that XRP was in fact a security, but affirmatively misrepresented to investors that it was not a security.  The Ripple Defendants knew XRP was a security before Defendants sold XRP into the market.  For example, according to the SEC, the Ripple Defendants received legal advice before selling XRP that XRP was a security, but the Ripple Defendants proceeded to offer XRP for sale to investors without registering with Florida (or federal) regulators or disclosing that XRP was a security to investors.  The Ripple Defendants actively concealed from investors the true nature of XRP.

256.    The Ripple Defendants intended for investors to rely on their misrepresentations and omissions, and to act on them by investing in XRP tokens.

257.    Plaintiffs and Class members relied on the Ripple Defendants' misrepresentations and omissions, and had Plaintiffs and Class members known that XRP was in fact an unregistered security, they would have been aware of that fact and would not have purchased XRP.

258.    Plaintiffs and Class members suffered injury and actual damages by investing in XRP in reliance on Defendants' misrepresentations and omissions.

**COUNT V**
**Conversion**
**(On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)**

259.    Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.

260.    Plaintiffs and Class members transferred to the Ripple Defendants valuable fiat currency and/or cryptocurrency for the purpose of acquiring the Ripple Defendants' XRP tokens.

261.    The Ripple Defendants have and continue to keep Plaintiffs' and Class members' fiat currency and/or cryptocurrency despite the Ripple Defendants' lack of ownership interest in the assets.

262.    By refusing to return the money and/or cryptocurrency paid for the XRP tokens, the Ripple Defendants intended to interfere with, and did interfere with, Plaintiffs' and Class members' ownership and interest in, and right to possess the fiat currency and/or cryptocurrency and have permanently deprived Plaintiffs and the Class of their property.

263.    Defendants have utilized Plaintiffs' and Class members' property to cover their own business expenses and enrich themselves.

264.    As a result of Defendants' conversion of Plaintiffs' and Class members' assets to their own corporate and personal use, Plaintiffs and Class members have suffered damages.

## COUNT VI
**Unjust Enrichment**
**(On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)**

265.    Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.

266.    Plaintiffs and Class members have conferred a benefit on the Ripple Defendants in the form of fiat currency and/or cryptocurrency used to acquire the Ripple Defendants' XRP tokens.

267.    The Ripple Defendants had knowledge of the benefit, and in fact knowingly sold unregistered XRP tokens to Plaintiffs and Class members for the purpose of acquiring funds from Plaintiffs and Class members.

268.    The Ripple Defendants voluntarily accepted the funds from Plaintiffs and Class members in exchange for XRP tokens and have retained (and continue to retain) the benefits conferred on them by Plaintiffs and Class members.

269.    The circumstances are such that it would be inequitable for the Ripple Defendants to retain the benefit without first paying the value thereof to Plaintiffs and Class members because the Ripple Defendants sold unregistered XRP tokens to Plaintiffs in violation federal and Florida law, and have profited at the expense of Plaintiffs and Class members.

270.    Plaintiffs and Class members are therefore entitled to restitution from the Ripple Defendants.

## COUNT VII
## Money Had And Received
### (On Behalf Of Plaintiffs And The Class Against The Ripple Defendants)

271.    Plaintiffs hereby incorporate by reference the allegations contained in the Nature Of The Action section, paragraphs 20-21, and the Facts Common To All Claims section of the Complaint.

272.    Plaintiffs and Class members have conferred a benefit on the Ripple Defendants in the form of fiat currency and/or cryptocurrency used to acquire the Ripple Defendants' XRP tokens.

273.    The Ripple Defendants had knowledge of the benefit, and in fact knowingly sold unregistered XRP tokens to Plaintiffs and Class members for the purpose of acquiring funds from Plaintiffs and Class members.

274.    The Ripple Defendants voluntarily accepted the funds from Plaintiffs and Class members in exchange for XRP tokens and have retained (and continue to retain) the benefits conferred on them by Plaintiffs and Class members.

275.    The circumstances are such that it would be inequitable for the Ripple Defendants to retain the benefit without first paying the value thereof to Plaintiffs and Class members because the Ripple Defendants sold unregistered XRP tokens to Plaintiffs in violation federal and Florida law, and have profited at the expense of Plaintiffs and Class members.

276.    Plaintiffs and Class members are therefore entitled to restitution from the Ripple Defendants.

## COUNT VIII

**Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933**
**(On Behalf Of Plaintiff Toomey And The Crypto.com Class And Subclass Against Crypto.com)**

277.    Plaintiff Toomey hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 20, and the Facts Common To All Claims section of the Complaint.

278.    Defendant Crypto.com made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

279.    XRP are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) (defining "security" to include an investment contract).  This is because the same *Howey* test applies to both federal securities laws and Florida law (see paragraphs 137-188).

280.    Plaintiff Toomey and members of the Crypto.com Class and Crypto.com Subclass purchased XRP securities through Crypto.com's application.

281.    15 U.S.C. §§ 77e(a) states:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
>> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
>>
>> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

282.     As discussed above, there was no registration statement in effect related to XRP.

283.     In listing XRP on its platform and participating in the sale of unregistered XRP, Crypto.com violated 15 U.S.C. §§ 77e(a), and is liable to Plaintiff Toomey and the members of the Crypto.com Class and Crypto.com Subclass.  15 U.S.C. § 77l(a)

284.     As a direct and proximate result of Crypto.com's unregistered sale of XRP securities, Plaintiff Toomey and members of the Crypto.com Class and Crypto.com Subclass suffered damages.  Plaintiff Toomey and members of the Crypto.com Class and Crypto.com Subclass also seek injunctive relief permanently prohibiting further sales of unregistered XRP on the Crypto.com platform.

## COUNT XIX
### Violation of Florida's Deceptive and Unfair Trade Practices Act
### (On Behalf Of Plaintiff Toomey And The Crypto.com Subclass Against Crypto.com)

285.     Plaintiff Toomey hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 20, and the Facts Common To All Claims section of the Complaint.

286.     FDUPTA protects "the consuming public and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.212(2).

287.     Plaintiff Toomey and members of the Crypto.com Subclass  are "consumers" within the meaning of FDUPTA.  Fla. Stat. Ann. § 501.203(7) (" 'Consumer' means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.")

288.     Through running its platform and offering XRP for sale thereon, Crypto.com engaged in "trade and commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

289.     "A *per se* violation of the FDUPTA occurs when the transgression stems from " '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.' " *Williams v. Delray Auto Mall, Inc.*, 916 F. Supp. 2d 1294, 1300 (S.D. Fla. 2013) (quoting *Blair v. Wachovia Mortg. Corp.,* 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012)).

290.     Here, Crypto.com committed *per se* violations of FDUPTA by violating various provisions of federal securities laws.  Federal securities laws proscribe unfair methods of competition or unfair, deceptive, or unconscionable acts or practices and seek to protect consumers from fraud in the sale of securities and ensure that consumers receive important information concerning securities being offered for public sale.

291.     As explained in Count VIII, above, Crypto.com violated Sections 5 and 12(a)(1) of the Securities Act by participating in the sale of unregistered XRP securities to Plaintiff Toomey and Class members.

292.     Further, Crypto.com violated various sections of the Securities Exchange Act of 1934.  15 U.S.C. § 78a, *et seq.*  First, Crypto.com violated 15 U.S.C. § 78o (a)(1) by operating as an unregistered securities broker by effecting transactions in XRP on behalf of its customers, including Plaintiff Toomey and members of the Crypto.com Subclass.  15 U.S.C. § 78o (a)(1) ("It shall be unlawful for any broker or dealer . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered").

293.    Second, Crypto.com acted as an unregistered exchange because it effected transactions in XRP securities on behalf of its customers, including Plaintiff Toomey and members of the Crypto.com Subclass.  15 U.S.C. § 78e ("It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to . . . effect any transaction in a security . . . unless such exchange . . . is registered as national securities exchange under section 78f of this title").

294.    Crypto.com caused injury to Plaintiff Toomey and members of the Crypto.com Subclass because its actions caused Plaintiff Toomey and members of the Crypto.com Subclass to lose substantial sums of money by investing in the unregistered security XRP, which Crypto.com participated in the sale of by acting as an unregistered broker and exchange. Plaintiff Toomey and members of the Crypto.com Subclass suffered a substantial loss proximately caused by Crypto.com's conduct.

295.    Plaintiff Toomey and members of the Crypto.com Subclass suffered actual damages as a result of Crypto.com's conduct, as set forth in paragraphs 20, *supra*, as well as the general allegations contained herein regarding harm to the Class as a whole.

296.    Accordingly, Crypto.com is liable to Plaintiff Toomey and members of the Crypto.com Subclass for damages in amounts to be proven at trial, including attorneys' fees and costs.  Plaintiff Toomey and members of the Crypto.com Subclass also seek injunctive relief permanently prohibiting further sales of unregistered XRP on the Crypto.com platform.

### COUNT X
**Unjust Enrichment**
**(On Behalf Of Plaintiff Toomey And The Crypto.com Class And Subclass Against Crypto.com)**

297.    Plaintiff Toomey hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 20, and the Facts Common To All Claims section of the Complaint.

298.     Plaintiff Toomey and the Crypto.com Class and Subclass conferred a benefit on Crypto.com in the form of fees paid to Crypto.com to effectuate purchases of XRP.

299.     Crypto.com had knowledge of the benefit in that it accepted fees from customers like Plaintiff Toomey to effectuate XRP trades, as set forth on its website. [38]

300.     Crypto.com voluntarily accepted the funds from the fees Plaintiff Toomey and members of the Crypto.com Class and Subclass paid to buy, sell and exchange XRP on Crypto.com's platform and has retained (and continues to retain) the benefits conferred on it by Plaintiff Toomey and members of the Crypto.com Class and Subclass.

301.     The circumstances are such that it would be inequitable for Crypto.com to retain the benefit without first paying the value thereof to Plaintiff Toomey and members of the Crypto.com Class and Subclass because Crypto.com collected fees for transactions in unregistered XRP tokens to Plaintiff Toomey and members of the Crypto.com Class and Subclass in violation federal and Florida law, and have profited at the expense of Plaintiff Toomey and  members of the Crypto.com Class  and Subclass.

302.     Plaintiff Toomey and members of the Crypto.com Class and Subclass are therefore entitled to restitution from Crypto.com.

### COUNT XI
### Money Had and Received
### (On Behalf Of Plaintiff Toomey And The Crypto.com Class And Subclass Against Crypto.com)

303.     Plaintiff Toomey hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 20, and the Facts Common To All Claims section of the Complaint.

304.     Plaintiff Toomey and the Crypto.com Class and Subclass conferred a benefit on

---

[38] https://crypto.com/exchange/document/fees-limits (last visited 3/22/21).

Crypto.com in the form of fees paid to Crypto.com to effectuate purchases of XRP.

305.  Crypto.com had knowledge of the benefit in that it accepted fees from customers like Plaintiff Toomey to effectuate XRP trades, as set forth on its website. [39]

306.  Crypto.com voluntarily accepted the funds from the fees Plaintiff Toomey and members of the Crypto.com Class and Subclass paid to buy, sell and exchange XRP on Crypto.com's platform and has retained (and continues to retain) the benefits conferred on it by Plaintiff Toomey and members of the Crypto.com Class and Subclass.

307.  The circumstances are such that it would be inequitable for Crypto.com to retain the benefit without first paying the value thereof to Plaintiff Toomey and members of the Crypto.com Class and Subclass because Crypto.com collected fees for transactions in unregistered XRP tokens to Plaintiff Toomey and members of the Crypto.com Class and Subclass in violation federal and Florida law, and have profited at the expense of Plaintiff Toomey and  members of the Crypto.com Class  and Subclass.

308.  Plaintiff Toomey and members of the Crypto.com Class and Subclass are therefore entitled to restitution from Crypto.com.

<u>COUNT XII</u>
**Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933**
**(On Behalf Of Plaintiff Sergalis And The Kraken Class And Subclass Against Kraken)**

309.  Plaintiff Sergalis hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 21, and the Facts Common To All Claims section of the Complaint.

310.  Defendant Kraken made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to

---

[39] https://crypto.com/exchange/document/fees-limits (last visited 3/22/21).

carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

311.   XRP is a security within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) (defining "security" to include an investment contract).  This is because the same *Howey* test applies to both federal securities laws and Florida law (see paragraphs 137-188).

312.   Plaintiff Sergalis and members of the Kraken Class and Kraken Subclass purchased XRP securities through Kraken's application.

313.   15 U.S.C. §§ 77e(a) states:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
> > (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
> >
> > (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

314.   As discussed above, there was no registration statement in effect related to XRP.

315.   In listing XRP on its platform and participating in the sale of unregistered securities sales of XRP, Kraken violated 15 U.S.C. §§ 77e(a), and is liable to Plaintiff Sergalis and the members of the Kraken Class and Kraken Subclass.  15 U.S.C. § 77l(a)

316.   As a direct and proximate result of Kraken's unregistered sale of XRP securities, Plaintiff Sergalis and members of the Kraken Class and Kraken Subclass suffered damages. Plaintiff Sergalis and members of the Kraken Class and Kraken Subclass also seek injunctive relief prohibiting further sales of unregistered XRP on the Kraken platform.

## COUNT XIII
### Violation of Florida's Deceptive and Unfair Trade Practices Act
### (On Behalf Of Plaintiff Sergalis And The Kraken Subclass Against Kraken)

317.    Plaintiff Sergalis hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 21, and the Facts Common To All Claims section of the Complaint.

318.    FDUPTA protects "the consuming public and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.212(2).

319.    Plaintiff Sergalis and members of the Kraken Class and Kraken Subclass are "consumers" within the meaning of FDUPTA.  Fla. Stat. Ann. § 501.203(7) (" 'Consumer' means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.")

320.    Through running its platform and offering XRP for sale thereon, Kraken engaged in "trade and commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

321.    "A *per se* violation of the FDUPTA occurs when the transgression stems from " '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.' " *Williams v. Delray Auto Mall, Inc.*, 916 F. Supp. 2d 1294, 1300 (S.D. Fla. 2013) (quoting *Blair v. Wachovia Mortg. Corp.,* 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012).

322.    Here, Kraken committed *per se* violations of FDUPTA by violating various provisions of federal securities laws.  Federal securities laws proscribe unfair methods of competition or unfair, deceptive, or unconscionable acts or practices and seek to protect

consumers from fraud in the sale of securities and ensure that consumers receive important information concerning securities being offered for public sale.

323.     As explained in Count XII, above, Kraken violated Sections 5 and 12(a)(1) of the Securities Act by participating in the sale of unregistered XRP securities to Plaintiff Sergalis and Class members.

324.     Further, Kraken violated various sections of the Securities Exchange Act of 1934. 15 U.S.C. § 78a, *et seq.*  First, Kraken violated 15 U.S.C. § 78o (a)(1) by operating as an unregistered securities broker by effecting transactions in XRP on behalf of its customers, including Plaintiff Sergalis and members of the Kraken Subclass.  15 U.S.C. § 78o (a)(1) ("It shall be unlawful for any broker or dealer . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered").

325.     Second, Kraken acted as an unregistered exchange because it effected transactions in XRP securities on behalf of its customers, including Plaintiff Sergalis and members of the Kraken Subclass.  15 U.S.C. § 78e ("It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to . . . effect any transaction in a security . . . unless such exchange . . . is registered as national securities exchange under section 78f of this title").

326.     Kraken caused injury to Plaintiff Sergalis and members of the Kraken Subclass because its actions caused Plaintiff Sergalis and members of the Kraken Class and Subclass to lose substantial sums of money by investing in the unregistered security XRP, which Kraken participated in the sale of by acting as an unregistered broker and exchange.  Plaintiff Sergalis and Class members suffered a substantial loss proximately caused by Kraken's conduct.

327.     Plaintiff Sergalis and members of the Kraken Subclass suffered actual damages as a result of Kraken's conduct, as set forth in paragraphs 21, *supra*, as well as the general allegations contained herein regarding harm to the Class as a whole.

328.     Accordingly, Kraken is liable to Plaintiff Sergalis and the Kraken Subclass for damages in amounts to be proven at trial, including attorneys' fees and costs.  Plaintiff Sergalis and members of the Kraken Subclass also seek injunctive relief prohibiting further sales of unregistered XRP on the Kraken platform

**COUNT XIV**
**Unjust Enrichment**
**(On Behalf Of Plaintiff Sergalis And The Kraken Class And Subclass Against Kraken)**

329.     Plaintiff Sergalis hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 21, and the Facts Common To All Claims section of the Complaint.

330.     Plaintiff Sergalis and the Kraken Class and Subclass conferred a benefit on Kraken in the form of fees paid to Kraken to effectuate purchases of XRP.

331.     Kraken had knowledge of the benefit in that it accepted fees from customers like Plaintiff Sergalis to effectuate XRP trades, as set forth on its website.[40]

332.     Kraken voluntarily accepted the funds from the fees Plaintiff Sergalis and members of the Kraken Class and Subclass paid to buy, sell and exchange XRP on Kraken's platform and has retained (and continues to retain) the benefits conferred on it by Plaintiff Sergalis and members of the Kraken Class and Subclass.

333.     The circumstances are such that it would be inequitable for Kraken to retain the benefit without first paying the value thereof to Plaintiff Sergalis and members of the Kraken

---

[40] https://support.kraken.com/hc/en-us/articles/201893638-How-trading-fees-work-on-Kraken (last visited 3/24/21).

Class and Subclass because Kraken collected fees for transactions in unregistered XRP tokens to Plaintiff Sergalis and members of the Kraken Class and Subclass in violation federal and Florida law, and has profited at the expense of Plaintiff Sergalis and members of the Kraken Class and Subclass.

334.   Plaintiff Sergalis and members of the Kraken Class and Subclass are therefore entitled to restitution from Kraken.

**COUNT XV**
**Money Had and Received**
**(On Behalf Of Plaintiff Sergalis And The Kraken Class And Subclass Against Kraken)**

335.   Plaintiff Sergalis hereby incorporates by reference the allegations contained in the Nature Of The Action section, paragraph 21, and the Facts Common To All Claims section of the Complaint.

336.   Plaintiff Sergalis and the Kraken Class and Subclass members conferred a benefit on Kraken in the form of fees paid to Kraken to effectuate purchases of XRP.

337.   Kraken had knowledge of the benefit in that it accepted fees from customers like Plaintiff Sergalis to effectuate XRP trades, as set forth on its website. [41]

338.   Kraken voluntarily accepted the funds from the fees Plaintiff Sergalis and members of the Kraken Class and Subclass paid to buy, sell and exchange XRP on Kraken's platform and has retained (and continues to retain) the benefits conferred on it by Plaintiff Sergalis and members of the Kraken Class and Subclass.

339.   The circumstances are such that it would be inequitable for Kraken to retain the benefit without first paying the value thereof to Plaintiff Sergalis and members of the Kraken Class and Subclass because Kraken collected fees for transactions in unregistered XRP tokens to

---

[41] https://support.kraken.com/hc/en-us/articles/201893638-How-trading-fees-work-on-Kraken (last visited 3/24/21).

Plaintiff Sergalis and members of the Kraken Class and Subclass in violation federal and Florida law, and has profited at the expense of Plaintiff Sergalis and members of the Kraken Class and Subclass.

340.    Plaintiff Sergalis and members of the Kraken Class and Subclass are therefore entitled to restitution from Kraken.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representative of the respective Classes and Plaintiffs' attorneys as Class Counsel to represent the Class members;

B.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.    For compensatory, statutory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded and statutory interest under the Act;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and

H.    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  March 26, 2021

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   _/s/ Sarah N. Westcot_____
          Sarah N. Westcot

Sarah N. Westcot (FBN:  1018272)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
Email: swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell (*pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: 212-989-9163
Email: aobergfell@bursor.com